UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Scott M. Matusick,

                            Plaintiff,

                                                            **Hon. Hugh B. Scott**

                                                            07CV489A

                    v.                                      **Report &
                                                            Recommendation**

Erie County Water Authority, et al.

                            Defendants.

        Before the Court is the defendants' motion for summary judgment (Docket No. 44).


## Background

        The plaintiff, Scott M. Matusick ("Matusick"), commenced this action in New York State

Supreme Court[1] alleging that while he was employed by the Erie County Water Authority

("ECWA") in 2004 he was assaulted, discriminated and harassed by his superiors at the ECWA

because of his association with Anita Starks, an African-American woman.  Named as

defendants in this action, in addition to the ECWA, are: Robert Mendez, the Director of the

---

        [1]  This action was removed to this Court pursuant to 28 U.S.C. §§1441, 1443, and 1446
inasmuch as the plaintiff seeks recovery based upon alleged federal civil rights violations, as well
as various state claims. (Docket No. 1).

ECWA ("Mendez"); Gary Bluman, an ECWA Foreman ("Bluman"); John Kuryak, ECWA

Distribution Engineer ("Kuryak"); James P. Lisinski, ECWA Coordinator of Employee Relations

("Lisinski"); David F. Jaros, ECWA Senior Distribution Engineer ("Jaros"); Karla Thomas,

Director of Human Resources ("Thomas"); Helen Cullinan Szvoren, Director of Human

Resources ("Szvoren"); Matthew J. Baudo, secretary to the ECWA ("Baudo"); Robert

Guggemos, ECWA Distribution Engineer ("Guggemos"); and Joseph Marzec ("Marzec").[2]

(Complaint at ¶¶2-14).

More specifically, the plaintiff asserts in May of 2004 he began associating with Starks

and her two children, who would, on occasion, come to the plaintiff's place of employment.

(Complaint at ¶ 19).  He claims that on July 2, 2004, he was assaulted by Bluman and was

thereafter subjected to a pattern of racial slurs and derogatory remarks by his fellow employees

and supervisors directed at Matusick, Starks and her family. (Complaint at ¶¶ 20-22).  Matusick

claims that from July 2, 2004 to October 31, 2005, fellow employees and supervisors called him

"nigger lover"; referred to his friend, and African-American co-workers at ECWA as "niggers"

and "lazy niggers"; he was told he had become a "nigger" by reason of his association with

Starks; that her children were referred to as "porch monkeys" and "nigglettes"; that he was acting

and dressing like a "nigger"; and that Starks was referred to as a "nigger bitch." (Complaint at ¶

24).  Matusick asserts that Bluman used ECWA workers and equipment to cause the lid to his

garbage can to be placed on the roof of his house and used duct tape to tape the front door to the

plaintiff's house shut. (Complaint at ¶25).   The plaintiff alleges that he reported the July 2, 2004

---

[2]   "The Complaint" is attached as Exhibit 2 to the removal papers (Docket No. 1, Exhibit 2).

assault by Bluman to his supervisors but that Bluman was not subjected to any disciplinary action. (Complaint at ¶¶ 27-29).  He alleges that following the July 2, 2004 assault, a video recording camara was placed in the ECWA dispatch office. (Complaint at ¶ 30). Matusick claims that the racial slurs and remarks continued.  According to the plaintiff, on April 18, 2005, Kuryak, Mendez, Lisinski, Bluman, Guggemos, Jaros, and Szvoren aided and abetted in retaliatory action against Matusick by placing charges against Matusick (and Marzec) for blocking the video recording camera placed in the dispatch office. (Complaint at ¶¶ 32-33).  The plaintiff asserts that he was advised by Lisinski that he was fired for this conduct.  A union representing Matusick negotiated with the ECWA to have Matusick's termination recinded. Matusick asserts that, under duress, he agreed to accept a 60-day suspension without pay. Marzec, who was similarly charged, received a 30-day suspension. (Complaint at ¶¶ 34-35). The plaintiff contends that he was subject to disparate treatment in that the defendants used the video camera in the dispatch officer only to videotape him and to used the videotapes to assist in the creation of charges on which to base a pretextual termination. (Complaint at ¶ 36). He claims that he was threatened with bodily harm by fellow employees not to involve them in charges of using a box to obstruct the camera. (Compalint at ¶ 38).  Matusick returned to work on July 5, 2005, after serving the suspension.  He asserts that  an investigation was commenced with respect to incidents on October 1, 2005 and October 20, 2005, and that as a result of the investigation, he was charged with failing to properly perform his duties which resulted in customers sustaining water damage to their property.  (Complaint at ¶¶ 40-41).  He argues that defendants Kuryak and Jaros intentionally (or negligently) destroyed videotapes made by the camera in the dispatch office on October 1, 2005 which would have established a defense to the charges brought against

him. (Complaint at ¶ 42).  The plaintiff claims that Marzec was coerced and threatened with suspension or termination if he did not agree to testify against Matusick. (Complaint at ¶45). After an administrative hearing pursuant to Article 75 of the New York State Civil Service Law, the hearing officer rendered a decision terminating the plaintiff as an ECWA employee on April 7, 2006.

In the instant complaint, Matusick asserts that he was physically assaulted (Count 1); that he was the victim of unlawful discrimination and a hostile work environment pursuant to §296 of the New York State Executive Law ["§296"] (Count 2); that he received disparate treatment in violation of §296 (Count 3); that he was retaliated against in violation of §296; that the defendants' conduct violated his First and Fourteenth Amendment rights (Count 5); and that the defendants' conduct constituted the infliction of emotional distress (Count 6).

The defendants contend that Matusick was terminated due to his failure to properly perform the duties of his position as a dispatcher for the ECWA. Prior to the October 2005 incidents leading to the plaintiff's termination, Matusick had been disciplined on other occasions during his employment with the ECWA. The record reflects that on November 18, 1997, George Hasiotis, then the ECWA Commissioner, sent a memo to Jaros, ECWA Director of Distribution, complaining of Matusick's conduct.  Hasiotis stated that on Sunday, October 16, 1997 he called the dispatcher, who was Matusick on that date, to state that he would be coming by to get fuel for his vehicle. Hasiotis reported:

> I arrived at the Service Center at @3:05 - 3:10 through the
> center main gate, directly in front of the dispatcher's window,
> assuming that with prior notice of my visit and by driving slowly
> directly in front of the dispatcher's view, that he and the duty man
> would have additional time to prepare for my arrival.  I then

4

proceeded to the fuel pump station at the back of the building.

After waiting at the pumps for a few minutes, I left the pump station and went to the dispatch room to see if there might be a reason for the delay.  As I entered the dispatch office I expected the delay might be caused by the staff engaged in authority business, but found Mr. Matusick slouched in the dispatcher's chair loudly engaged in a football game he was watching on the overhead TV.  This explained why Mr. Matusick did not see my vehicle entering the grounds.  As I entered the room, Mr. Matusick had not seen me, but he jumped-up and looked out the window as he screamed out "what kind of an asshole would call during the fourth quarter of the game."   At that point I surprised him with my presence when I verbally countered, "what kind of an asshole isn't doing his job."

I am clearly concerned about the conduct and responsibility of the dispatch office. If a commissioner gets this kind of treatment I question what might happen to a customer calling-in and the response of the ECWA. Secondly, part of the off-hours dispatch office responsibility is to maintain security at the facility but if a dispatcher is otherwise engaged with entertainment – or other forms of dereliction of duty – then can he properly perform such duties.  On this particular occasion, for example, anyone could have entered the "secure" areas of the property.

(Docket No. 47, Exhibit 6).

On January 27, 2005, Matusick was given a written warning based upon his failure to

properly record an entry in the log book and prepare appropriate paperwork relating to a call by

another EVWA employee. (Docket No. 47, Exhibit 7). The plaintiff does not appear to dispute

that he violated ECWA policy in April of 2005 by interfering with the camera installed in the

dispatch office by blocking the view of the camera. (Docket No. 47, Exhibit 8). He acknowledges

that he agreed to a 60-day suspension without pay as a result of this infraction. (Docket No. 47,

Exhibit 9). As noted above, the plaintiff contends that he was subject to disparate treatment in

this regard because he was singled out for punishment based upon this conduct.  The plaintiff

acknowledges that Marzec was also disciplined for this same conduct in April of 2005, but notes

5

that Marzec was only required to agree to a 30-day suspension without pay. (See (Docket No. 47, Exhibits 10 and 11). The record reflects, however, that ECWA employee Thomas Radich was also charged with similar conduct in April of 2005 (Docket No. 47, Exhibit 12) and that Radich agreed to a 90-day suspension without pay and was returned to work on a "Last Chance" basis. (Docket No. 47, Exhibit 13).

Matusick was terminated after being found guilty of three formal charges after an administrative hearing. (Docket No. 47, Exhibit 16).  The first formal charges levied against Matusick alleged that on October 1, 2005, at 4:26 a.m. he received a call from an individual who identified himself as an employee of the Town of Amherst Highway Department reporting a possible water line break and the presence of water in the street at 36 Shimwood Court in Amherst but failed to timely respond.  Matusick was alleged to have responded that the ECWA would check on the report, but failed to dispatch an ECWA utility worker to the scene of the reported line break. According to the charge, it was not until a second call came in, more than an hour later, reporting a water line break at the corner of Montbleu Drive and Shimwood Court that Matusick dispatched a worker to the area who was required to turn off the water at that location and remain on the scene due to damage to the road. (Docket No. 47, Exhibit 16, ¶¶ 1-12). In Charge II,  Matusick was charged with being observed sleeping while on duty as dispatcher on October 1, 2005 (Docket No. 47, Exhibit 16, ¶¶ 13-15).  Finally, Charge III alleged that on October 20, 2005, Matusick again failed to properly respond to a call of possible water leak.  On this occasion, Matusick received a call on October 20, 2005 at 1:50 a.m. from an individual who identified himself as a resident on New Road, in the Town of Clarence, New York. Matusick advised this individual that nothing could be done until "daylight." A second call was received by

6

Matusick from a New Road resident (this caller was a female, not the original caller) at 5:15 a.m.

A third call, from yet another resident on New Road (also a female), came in at 5:22 a.m.  It was

not until the third call was received that Matusick allegedly dispatched a worker to respond to the

calls. (Docket No. 47, Exhibit 16, ¶¶ 16-23).

A hearing was held with respect to the formal charges on December 7, 2005, December

23, 2005, December 29, 2005, January 4, 2006 and February 6, 2006 before Hearing Officer

Michael S. Lewandowski.  Written closing arguments were received on March 16, 2006.

Lewandowski issued his Report & Recommendation on April 7, 2006, upholding all three

charges. (Docket No. 47, Exhibit 18).  The videotapes of the surveillance camera in the dispatch

office were not offered into evidence inasmuch as the ECWA asserted that the tapes were

automatically recorded over.[3]  Audio tapes of the underlying calls were received into evidence.

The call at 4:26 a.m. regarding a water leak at 36 Shimwood Court revealed that the Town

employee reported "a very large water break" and that the call was not recorded by Matusick in

the logbook. (Docket No. 47, Exhibit 18 at page 9).[4]  According to Lewandowski, Marzek

testified that he was with Matusick on October 1, 2005 from 4:00 a.m. until the water leak report

was addressed. Marzec testified that he was in the dispatch office when Matuscik got a call at

about 4:15 a.m. and that all he heard was Matusick answer the phone and say "wrong number."

---

[3]  Thus, Lewandowski denied a motion to dismiss the charges based upon a spoliation of evidence argument. (Docket No. 47, Exhibit 18 at pages 7-8).

[4]  According to Lewandowski, Matusick testified that he made a note of the call on a piece of scrap paper and intended to enter it into the logbook at a later time, but failed to do so. Matusick also claimed that he had difficulty finding a water utility worker and could not access the computer system for 30-40 minutes, and had to use the computer in the foreman's office to get information.  Lewandowski noted that Matusick did not mention having a computer problem when he was interviewed on October 26, 2005.   (Docket No. 47, Exhibit 18, page 10).

(Docket No. 47, Exhibit 18, page 10).[5]  Lewandowski stated that the audiotape of a call from the

Amherst Police Department at 5:30 a.m. reflects that Matusick failed to mention that the leak had

previously been reported. (Docket No. 47, Exhibit 18, page 11).[6]  Lewandowski concluded that

the evidence reflected that Matusick failed to respond to the call concerning a water break on

October 1, 2005 in a timely manner. (Docket No. 47, Exhibit 18, 12-13).[7]

─────────────────────

[5]  It is not certain that the call to which Marzec heard Matusick respond "wrong number" was a call concerning a water leak.  Marzec testified that another call came in while Marzec was outside the dispatch office.  Also, Marzec did state that Matusick was having difficulty printing something on the computer that morning, but suggested that the delay attributed to the computer could have been "ten minutes or so." (Docket No. 47, Exhibit 18, page 11).

[6]  In response to the instant motion, the plaintiff argues that the first call he received on October 1, 2005 was at 5:00 a.m. from the Amherst Police. (Docket No. 74 at page 4).  Matusick asserts that in response to damage claims filed by a Schimwood Drive resident, the ECWA looked for calls relating to the October 1, 2005 incident and that on October 11, 2005 Lisinski and Jaros advised Matusick that they were unable to locate any call for this incident prior to 5:00 a.m.  Thus, the insurance claim filed by the resident was denied. (Docket No. 71 at ¶ 48).  The plaintiff suggests that the credibility of the tapes is in question because "of how and when these tapes came into being, also as to the calibration on the machine as to the decibel level and Kuryak's lack of knowledge as to operating it.  Also as to whether it was functioning properly on October 1, 2005 as it did not record statements I specifically recall talking to Mr. Lipus." (Docket No. 71 at ¶70(a)). Matusick states that he recalled talking to "Mr. Lipkus" on New Road on October 1, 2005. (Docket No. 71 at ¶ 70).  The plaintiff's assertion that the first call on October 1, 2005 was from the Amherst Police appears inconsistent with the testimony provided by Matusick at the administrative hearing, as described by Lewandowski, to the effect that he made a note of the initial call on a scrap paper and meant to enter it into the logbook at a later time but did not do so.  Notwithstanding Matusick's allegations that Lisinski and Jaros stated on October 11, 2005 that they could not find an call earlier than 5:00 a.m for the October 1, 2005 incident, it appears undisputed that an audiotape of such a call was eventually located and produced at the administrative hearing.  The plaintiff does not attempt to explain the existence of the audio recording of the initial call from the Amherst Town employee reporting the leak on October 1, 2005.  Also, Matusick's Declaration appears to confuse the October 1, 2005 and October 20, 2005 incidents.  The record reflects that the October 20, 2005 incident, and *not* the October 1, 2005 incident, involved calls from residents on New Road.

[7]  Lewandowski upheld Specification III of Charge I, but dismissed Specifications I, II, IV and VI.  He found Specification V to be addressed by Specification III. (Docket No. 47, Exhibit 18, pages 13-14).

With respect to the charge that Matusick was observed sleeping while on the job as dispatcher on October 1, 2005, Marzek testified that he observed Matusick sleeping on two separate occasions that evening.  According to Lewandowski, Marzek testified that he had to wake-up Matusick at approximately 2:00 a.m., and again at approximately 4:00 a.m. (Docket No. 47, Exhibit 18, page 14).[8]  Based upon Marzec's testimony, Lewandowski concluded that the evidence supported the charge that Matusick was observed sleeping while on duty as dispatcher on October 1, 2005. (Docket No. 47, Exhibit 18, page 15).[9]

Finally, with respect to the conduct alleged in Charge III in the administrative proceedings, Lewandowski found that the audiotapes of the calls made on October 20, 2005 revealed that Matusick received three calls relating to problems on New Road. The first at 1:50 a.m., the second at 5:15 a.m., and the third at 5:22 a.m.  Lewandowski found that Matusick dispatched Marzec at approximately 5:30 a.m.  Lewandowski found that there was no basis to find that Matusick acted improperly with respect to the calls received at 5:15 a.m. and 5:22 a.m. inasmuch as Marzec was dispatched less than 15 minutes after those calls were received. (Docket No. 47, Exhibit 18, page 17).  With respect to the call received by Matusick at 1:50 a.m.,

---

[8]  Marzec testified that he and other ECWA employees have  "dozed off" on a number of occasions while at work and that they have not been disciplined for doing so. (Docket No. 47, Exhibit 18, pages 14-15).

[9]  Lewandowski rejected the plaintiff's arguments to find that Marzec's testimony was not credible: "There is not one scrap of evidence to indicate that Marzec had any reason to make the claim unless it was true.  Marzec was unshaken in his report as he was examined and cross-examined.  Marzkc gave specific detail as to his observations of Matusick sleeping and the need to wake Matusick up.  The respondent's representative petitions me to find Marzec not credible in his report of sleeping yet the representative petitions me to find Marzec credible as to his confirmation that Matusick had problems with the computer. The fact is that I find no reason not fo find Marzec credible on any point in his testimony.  Marzec was completely candid, admitting to his own misconduct." (Docket No. 47, Exhibit 18, pages 15-16).

Lewandowski noted that the audiotapes revealed that the caller reported a drop in water pressure. Matusick asked the caller if he saw water and the caller responded that he did not see water. Matusick advised the caller that "We don't send a guy out there by himself in the middle of the night looking for a water leak."  The caller then advised Matusick that the pressure was lower than it had ever been, even when there had been a prior water line break. (Docket No. 47, Exhibit 18, pages 17-18).  Further, Lewandowski found that the record reflected that Marzec was in the office and available to respond to the 1:50 a.m. call.  Marzec testified that he told Matusick that "it could very well be a water main break, that's usually what it is.  If there's low pressure usually it could be a water main break." (Docket No. 47. Exhibit 18, page 18).  Marzec testified that Matusick told him that Matusick thought it was low pressure on the caller's water line but the caller did not want to stay up to let him access his home. (Docket No. 47, Exhibit 47, page 18).  Sam Fessari, a retired dispatcher who worked for the ECWA for 32-years testified at the administrative hearing. He stated that he had never heard of an employee being disciplined for failure to dispatch to a low-pressure situation unless a pattern of failure to respond is established. (Docket No. 47, Exhibit 18, page 18).  Fessari stated that the determination to dispatch in response to a single call reporting low-pressure was "judgmental" and that he would "walk a caller through a series of questions directing him to make internal observations in his home before he would make a determination.." Fessari stated that he would not "just tell the caller the [ECWA] would send someone out in the morning – we can't do anything now." (Docket No. 47, Exhibit 18, pages 18-19).  According to Lewandowski, Matusick testified that he spoke to this first caller from New Road more than once on October 20, 2005, either just before or just after

the recorded call[10] and that he offered to send someone out, but the caller said, "hell no, I'm not

staying up." (Docket No. 47, Exhibit 18, page 19).  Lewandowski found that the audiotapes

clearly established that Matusick received only one call from the initial caller on October 20,

2005,[11] and that Matusick failed to take any of the steps Fessari (Matusick's own witness)

testified should have been followed in making a determination whether it was necessary to

dispatch a worker to that site. (Docket No. 47, Exhibit 18, page 20). Lewandowski noted that

Matusick was unaware that the location from which the caller was calling was considered a "high

pressure area" notwithstanding that Matusick had worked for the ECWA for 24 years. (Docket

No. 47, Exhibit 18, page 18). Lewandowski concluded that the ECWA was entitled to deem

Matusick's response to the 1:50 a.m. call unacceptable. (Docket No. 47, Exhibit 18, page 21).

Lewandowski further recommended that Matusick be dismissed from his position with the

ECWA:

> These offenses are in and of themselves serious.  While I may be
> inclined to recommend a penalty less severe than that proposed by
> the [ECWA] in other instances, I cannot do so here in light of the
> fact that the respondent has been recently disciplined for covering
> up a surveillance camera, an act that shows the respondent is not
> trustworthy.  The [ECWA] and the respondent reached an
> agreement to settle the prior charge with the imposition of a sixty-
> day suspension without pay.  The penalty previously imposed was
> extremely severe yet the evidence here shows that within a short
> period of time, the respondent engaged in behavior that can only be
> described as a violation of trust.  An area of concern for which the
> prior discipline was imposed.  The tenets of progressive discipline

---

[10]   Lewandowski's report does not reflect whether Matusick offered any explanation as to why this call, unlike the others, was not recorded.

[11]   According to Lewandowski, the context of the recorded conversation reflects that the caller identified himself and his location in full without any mention of any prior call to Matusick. (Docket No. 47, Exhibit 18, page 19-20).

> alone would merit the imposition of dismissal as the appropriate
> penalty in this case.  The fact that the respondent here is found
> guilty of again engaging in behavior that shows he cannot be
> trusted mandates that I recommend the penalty of dismissal in this
> manner.  The [ECWA] cannot be expected to continue to the
> employ of a person in the dispatch position on the night shift who
> cannot be trusted to remain alert, respond to problems that arise
> and to tell the truth about his performance of the job.

(Docket No. 47, Exhibit 18, pages 23-24). The recommendation was affirmed upon appeal to the

Erie County Civil Service Commission. (Docket No. 47, Exhibit 20).  Mendez adopted the

recommendation of the hearing officer, and Matusick was served with a termination notice dated

April 24, 2006.

The plaintiff commenced the instant action, alleging that his termination was a

discriminatory act motivated by his interracial relationship with Starks. In support of his claims

of discrimination and disparate treatment, Matusick alleges the following incidents of racial

harassment:

    1.    Bluman used the word "nigger" in remarks directed toward
        Matusick at least three times a week. (Docket No. 71 at ¶
        7).

    2.    On July 2, 2004, Matusick asserts that he was assaulted by
        Bluman, who allegedly pinned Matusick in his chair, put a
        pencil or pen to Matusick's neck and stated "I'm going to
        kill you, you mother 'F ing N lover.'[12]  I'm going to kill all
        those mother 'F ing  Ns' and you are a 'F ing  N' now too;"
        according to Matusick, Bluman also threatened to kill
        Matusick's family.[13]  Matusick asserts that these threats

---

[12]   Abbreviations are used by the plaintiff. (Docket No. 71 at ¶3).

[13]   Matusick alleges that Bluman was pulled off him and taken out of the office by Kevin
Egan.  (Docket No. 71 at ¶8).  In a memo to Jaros, Egan stated that "on Friday, July 2nd, 2004,
Gary Bluman and Scott Matusick had quite a heated discussion at or near 6:30 am.  The problem
arose when Gary approached Scott and asked him to generate a leak report for the job he was

were known to Guggemos and Lisinski. (Docket No. 71 at ¶8).[14]

3.    From the middle of August 2004 until the last day Matusick worked at the ECWA, Bluman allegedly continued to make racial remarks to Matusick; referring to Starks using the term N bitch; "the N is here"; "look at the N lovers"; "kill all the Ns (Docket No. 71 at ¶¶ 10-12).

4.    In the summer of 2004, Bluman allegedly went onto Matusick's property, put Matusick's garbage can lids onto Matusick's roof and duct tapped Matusick's door shut. (Docket No. 71 at ¶13).[15]

5.    Matusick asserts that Timothy Elling and William Faircloth, other ECWA dispatchers, often used the N word about African American workers at the ECWA. Matusick does not allege that these individuals made racial remarks directed to him. (Docket No. 71 at ¶ 15).[16]

6.    The plaintiff asserts that another dispatcher, Brenden Finn,

---

going to do that day. Scott showed some apprehension as he has in the past a few times, probably because it is near the end of his shift. In the past it really has not been a problem, [due] to the fact that when he complained either myself or Rob Guggermos would interject and tell him that this was his job duty. There has not been a problem since Friday, and hopefully in the future this will no longer be a problem, but never the less the situation will be watched very closely." (Docket No. 48, Exhibit G).

[14]  Matusick states that he complained about the incident to Guggemos and Kuryak "by going to their offices several times." According to Matusick, he was told that "Bluman would be talked to." Bluman's work pattern was changed for approximately 45 days. Bluman would give any paperwork to other persons to deliver to Matusick. Matusick stated that after this period, Bluman resumed directing racial remarks toward Matusick. (Docket No. 71 at ¶9).

[15]  The plaintiff states that he was told Bluman did this "by one of his crew." Matusick asserts that Bluman "thought it was a joke" but that the plaintiff did not "think it was a joke." Matusick states that he did not report this conduct to his superiors because he did not want any trouble with Bluman. (Docket No. 71 at ¶ 13).

[16]  Matusick states that Marzec told him that "the other dispatchers" were not his friends and that they call him a "N lover" behind his back. (Docket No. 71 at ¶ 15). The "other dispatchers" were not identified by name.

made racially derogatory slurs directed at him after June of 2004. Matusick states that at least three times a week, Finn would say "here comes the N" or "where did the other Ns go?" or " Oh, the other Ns are leaving." Finn also allegedly called Stark's children "porch monkeys or nigglettes." (Docket No. 71 at ¶ 16).

7.  On July 8, 2005[17], Finn allegedly harassed Matusick for coming in 10 minutes late, saying: "you're just like a N"; "all them 'F ing Ns are always late and now you are one of them." Matusick alleges that Finn proceeded to chase him around the building. The plaintiff states that he logged the incident into the logbook and called Guggemos to complain of Finn's conduct. (Docket No. 71, at ¶17).[18] Matusick asserts that his superiors stated that Finn would be talked to and that it would not happen again. (Docket No. 71 at pp 17).

8.  The plaintiff asserts that approximately one month after the July 8, 2005 incident, Finn made further racial remarks: "Oh, the Ns drop you off?"; "Where's the rest of the N family?"; "Good night to all the N lovers." (Docket No. 71 at ¶ 17(b)).

9.  Finn saw Ivan Carmichael, an African American ECWA employee, talking to Starks and allegedly stated to Matusick that there is "a N trying to steal your N bitch." Matusick states that he reported this to Carmichael, who in turn, reported the incident to Geggemos. (Docket No. 71 at ¶ 18).

10.  Other ECWA workers allegedly directed racial slurs at

---

[17]  The plaintiff's declaration states that this conduct occurred on July 18, 2005. This appears to be a typographical error inasmuch as the logbook reflects the incident taking place on July 8, 2005 and the plaintiff refers to the incident as occurring on July 8, 2005 later in the paragraph. (Docket No. 71 at ¶17(b)).

[18]  The logbook reflects a note by Matusick: "Harrased by Brendan Finn on whole shift change. He harassed & taunted me for the record!!" (Docket No. 48, Exhibit H). The logbook also reflects that Matusick called Guggemos: "Called duty Engineer / R. Guggemos to report the harassment incident re:Brendan Finn & his belligerent & nasty remarks about me & my father & family ... etc .... etc..." (Docket No. 48, Exhibit H).

Matusick after he openly associated with Starks: Tim
Tomasik allegedly referred to Starks and Matusick as Ns;
John Yonkonsky allegedly called all African American
employees at ECWA "Ns" and referred to Starks as an "N"
and to Matusick as an "N lover"; William Faircloth
allegedly referred to Matusick as a "N lover" and Starks as
a "N broad"; Jim Lisinski allegedly threatened Matusick by
staying that he would "fix my N loving ass" and twice a
month would say "where's your N woman now"; Ed
Roberts allegedly referred to Starks as an "N broad";
Patrick Kelly allegedly called Matusick a "N lover" and
referred to Starks as a "N broad"; Robert Vacanti allegedly
stated "you hang around with Ns and pretty soon you are a
N too";  Bernard Giemek allegedly advised Matusick to
"stay away from the Ns, they are no good. White people
shouldn't hang around with Ns."; after Matusick's
confrontation with Bluman, Giemek allegedly stated to
Matusick "it's your fault for hanging around with Ns"; Bart
Deitz referred to Matusick as an N and to Starks as an "N
broad"; Stephen Garraglia allegedly told Matusick that he
"dressed like a N" and referred to Starks as "your N";
Battaglia would allegedly say: "what do you call little Ns,
Answer Niglettes" and "you are a fat N, what did you do,
join the circus?"  (Docket No. 71 at ¶ 20).

11.     The plaintiff alleges that the N word was used generally to
        refer to African American workers by the following ECWA
        employees: West Dust, Jim Lisinski, Daniel Calderon,
        David Jaros, John Kunyak, John Catanzaro, Edward Byrne,
        Joseph Marzec and Mike Martin. (Docket No. 71 at ¶ 21).

## Discussion

### Standard of Review

Summary judgment is appropriate where there are no issues of material fact in dispute,

and the moving party is entitled to judgment as a matter of law.  See Trans Sport, Inc. v. Starter

Sportswear, Inc., 964 F. 2d 186, 188 (2nd Cir. 1992) citing Bryant  v. Maffucci, 923 F.2d 979,

982 (2d Cir. 1991).  The non-moving party must, "demonstrate to the court the existence of a

genuine issue of material fact." Lendino v. Trans Union Credit Information, Co., 970 F.2d 1110,

1112 (2nd Cir. 1992), citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  A fact is

material:

> when its resolution would "affect the outcome of the suit under the
> governing law" and a dispute about a material fact is genuine "if
> the evidence is such that a reasonable jury could return a verdict
> for the non-moving party."

General Electric Company v.  New York State Department of Labor, 936 F.2d 1448, 1452 (2nd

Cir. 1991), quoting Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The non-

moving party must come forward with enough evidence to support a jury verdict ... and the ...

motion will not be defeated merely ... on the basis of conjecture or surmise."  Trans Sport, supra,

964 F.2d at 188. To defeat a motion for summary judgment, the nonmovant cannot simply rely

on allegations in the pleadings that merely raise "some metaphysical doubt as to the material

facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the

nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in

[its] favor." *Anderson*, at 256.


    The §1983 Constitutional Claims Against ECWA and
       Individual Defendants in their Official Capacity


The plaintiff alleges that the defendants "acted with intent to violate or with deliberate

indifference to Plaintiff's clearly established rights under the First and Fourteenth Amendment."

(Complaint at ¶63).  The plaintiff's primary §1983 claim appears to be that the defendants' allegedly interfered with Matusick's association with Starks due to her race. The defendants argue that the §1983 claims against ECWA and the individual defendants in their official capacity [referred to collectively as the "municipal defendants"] must be dismissed because the plaintiff can point to no custom, practice or policy on the part of the ECWA pursuant to which the plaintiff's rights were violated. Under Monell v. Department of Social Services, 436 U.S. 658, 694 (1978), a municipality cannot be held liable under §1983 based upon the doctrine of *respondeat superior*. A plaintiff must prove that "policies or customs that [were] sanctioned" by the municipality led to the alleged constitutional violation. Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir.2006); Missel v. County of Monroe, 2009 WL 3617787, *1 (2d Cir. 2009). Generally, there are four sets of circumstances in which a municipality can be held liable under section 1983: (1) an officially promulgated policy endorsed or ordered by the municipality, (Pembaur v. City of Cincinatti, 475 U.S. 469, 480 (1986)); (2) a custom or practice that is so pervasive and widespread that the municipality had either actual or constructive knowledge of it, (City of St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988); Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)); (3) actions taken or decisions made by the municipal employee who, as a matter of state law, is responsible for establishing municipal policies with respect to the area in which the action is taken, (McMillian v. Monroe County, 520 U.S. 781, 784-85 (1997); Praprotnik, 485 U.S. at 129-30); or (4) the failure of the municipality to train its employees such that the failure rises to the level of deliberate indifference to the constitutional rights of others (City of Canton v. Harris, 489 U.S. 378, 385 (1989); Walker v. New York, 974 F.2d 293, 297 (2d Cir.1992)). See also Perfetto v. Erie County Water Authority, 2006 WL 1888556, *6

17

(W.D.N.Y.,2006)(Elfvin, J.).

The plaintiff acknowledges that the ECWA did not have a formal policy endorsing or ordering discrimination to take place, but Matusick contends that "the custom or practice of engaging [in] racially offensive conduct was so pervasive or widespread ... that the ECWA had knowledge (actual or constructive) – here communicated by plaintiff to both his supervisors and the Human Resource department." (Docket No. 74 at page 9). The plaintiff further contends that Mendez's decision to follow the recommendation of the independent hearing officer to terminate Matusick constituted conduct by a person with policymaking authority. Finally, the plaintiff also asserts that the ECWA failed to adequately train its employees concerning racial harassment. (Docket No. 74 at page 9).

Initially, the defendants assert that, at the relevant time, the plaintiff had no Constitutionally protected associational right in this case. "The First Amendment, while not expressly containing a 'right of association,' does protect 'certain intimate human relationships,' as well as the right to associate for the purposes of engaging in those expressive activities otherwise protected by the Constitution." Freeman v. City of Santa Ana, 68 F.3d 1180, 1188 (9th Cir.1995) quoting Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984). The First Amendment right of association "protects those relationships, including family relationships, that pre-suppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of beliefs but also distinctly personal aspects of one's life.' " Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte, et al., 481 U.S. 537, 545-46, (1987) quoting Roberts, 468 U.S. at 619-20.

The plaintiff relies upon Wilson v. Taylor, 733 F.2d. 1539, 1544 (11th Cir. 1984) which

18

had held that a "state violates the fourteenth amendment when it seeks to interfere with the social

relationship of two or more people" and that "dating is a type of association which must be

protected by the first amendment's freedom of association." Wilson, 733 F.2d at 1544.  The

defendants argue that Wilson was decided before Roberts and is no longer good law.  (Docket

No. 78 at page 2-3).  The defendants argue that the plaintiff's claim must be considered solely

under the analytical framework of a  Fourteenth Amendment substantive due process claim.

However, in Adler v. Pataki, 185 F.3d 35, 44 (2d. Cir. 1999), the Second Circuit held that

retaliatory conduct based upon the plaintiff's relationship with his or her spouse should be

analyzed as a violation of a First Amendment right of intimate association.  Adler, 185 F.3d. at

44 ("Though the matter is not free from doubt, we think a spouse's claim that adverse action was

taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed

as a claimed violation of a First Amendment right of intimate association.).  Here, the plaintiff

asserts that he was discriminated against because of Stark's race. In both instances, the plaintiff

alleged retaliatory conduct on the part of the defendants due to the protected activity or protected

classification of their significant other.  The defendants also argue that these types of cases do not

recognize relationship outside the familial area. (Docket No. 78 at page 2).  However, Courts

have recently extended the First Amendment associational rights to relationships outside of

marriage. Steinbach v. Branson, 2007 WL 2985571 (D.N.D. 2007)(While it does not appear that

the Supreme Court has explicitly extended the right of intimate association to close friends, such

as Steinbach's girlfriend, it is a logical extension of the Court's prior precedent). The Ninth

Circuit, in Wittman v. Saenz, 108 Fed.Appx. 548, 549 (9th Cir. 2004) has held that the First

Amendment right of association extends to individuals involved in an intimate relationship, such

as fiancés. In the instant case, the plaintiff represents that he and Starks considered themselves engaged at the time involved in this action, and have since married. (Docket No. 74 at page 10). The plaintiff has demonstrated that his relationship with Starks was sufficiently intimate to fall within the First Amendment's associational protection.[19]

The defendants argue that the plaintiff has produced no evidence of an unofficial custom of discriminating against White employees who date Black individuals. (Docket No. 50 at page 5). The plaintiff, as discussed above, has identified *fourteen* ECWA employees who have allegedly made racially charged remarks directly to him on virtually a daily basis over the period from July 2004 to October 2005.[20] The plaintiff claims that Bluman made racial remarks to him at least three time a week throughout this period. (Docket No. 71 at ¶10). Matusick claims that Brendan Finn made racial slurs directly to him "at every opportunity he had at work" which was also at least three times a week throughout this period. (Docket No. 71 at ¶ 16). According to Matusick, Finn made racially charged remarks to Matusick and then "lost control and chased" him around the building. Matusick claims that he felt it necessary to make an entry regarding

---

[19]   The plaintiff also appears to assert a procedural due process claim alleging that he was not provided certain discovery during the administrative proceeding and that the administrative hearing was a sham. (Docket No. 74 at page 11). The plaintiff suggests that regardless of what the hearing officer recommended, Mendez would have terminated Matusick. The plaintiff provides no factual or legal support for this prognostication. The plaintiff also argues that although §76 of the Civil Service Law and Article 78 of the New York State Civil Practice Law and Rules allow for the plaintiff to seek appellate review with respect to the administrative hearing, these appellate avenues are insufficient because the scope of review and the discovery mechanisms available are not adequate. Again, the plaintiff again cites no legal support for this proposition. The plaintiff has failed to sufficiently articulate a procedural due process claim in this case.

[20]   The plaintiff identifies eight additional ECWA employees as regularly referring to African American employees at the ECWA in racially derogatory terms. (Docket No. 71 at ¶ 21).

20

this attack in the ECWA logbook and to immediately call Guggemos. (Docket No. 71 at ¶ 17).

The plaintiff alleges that he brought this conduct to the attention of his superiors at the ECWA on

at least six occasions. (Docket No. 71 at ¶¶ 9, 17 and 26).  Matusick states that he feared having

to work with Bluman based upon his racially motivated remarks. (Docket No. 71 at ¶¶ 9(a-c),

10).  This conduct, if accepted by a trier of fact, is sufficient to establish a custom or practice that

is so pervasive and widespread that the ECWA  had either actual or constructive knowledge of it.

      The plaintiff also contends that because Mendez has discretion whether or not to accept

the administrative hearing officer's recommendation, Mendez is purportedly a "policymaker" and

his determination to terminate Matusick's employment with the ECWA was sufficient to confer

liability upon the ECWA. Although the official in question does not have to be a final

policymaker for all purposes, but only with respect to the conduct challenged, simply exercising

discretion in an area where that official is not the final policymaker under state law cannot, by

itself, establish municipal liability. City of St. Louis v. Praprotnik, 485 U.S. 112, 139-40 (1988);

Barry v. New York City Police Dept., 2004 WL 758299, 14 (S.D.N.Y.,2004). The defendants

suggest that Mendez is not a policymaker with respect to the determination to terminate Matusick

because as Executive Director he can only make such determinations based upon the New York

State Civil Service Law and the terms and provisions of the Collective Bargaining Agreement

("CBA"). Further, the defendants assert that inasmuch as Mendez's determination was

appealable under various provisions of the Civil Service Law and Article 78 New York State

Civil Practice Law and Rules ("CPLR"), it is not a "final" determination making Mendez a

policymaker for purposes of Monell.  The plaintiff contends that an appeal under §76 of the Civil

Service Law in "not on the merits, but is limited to a review under Article 78 of the CPLR.

(Docket No. 74 at page 10).  The plaintiff cites no authority for this proposition.  The appellate

provisions of §76 provide the following process:

> 1. Appeals. Any officer or employee believing himself aggrieved
> by a penalty or punishment of demotion in or dismissal from the
> service, ... imposed pursuant to the provisions of section seventy-
> five of this chapter, may appeal from such determination either by
> an application to the state or municipal commission having
> jurisdiction, or by an application to the court in accordance with
> the provisions of article seventy-eight of the civil practice law and
> rules. If such person elects to appeal to such civil service
> commission, he shall file such appeal in writing within twenty days
> after service of written notice of the determination to be reviewed,
> such written notice to be delivered personally or by registered mail
> to the last known address of such person and when notice is given
> by registered mail, such person shall be allowed an additional three
> days in which to file such appeal.

> 2. Procedure on appeal. Where appeal is taken to the state or
> municipal commission having jurisdiction, such commission shall
> review the record of the disciplinary proceeding and the transcript
> of the hearing, and shall determine such appeal on the basis of such
> record and transcript and such oral or written argument as the
> commission may determine. The commission may direct that such
> appeal shall be heard by one or more members of the commission
> or by a person or persons designated by the commission to hear
> such appeal on its behalf, who shall report thereon with
> recommendations to the commission. Upon such appeal the
> commission shall permit the employee to be represented by counsel.

> 3. Determination on appeal. The determination appealed from may
> be affirmed, reversed, or modified, and the state or municipal
> commission having jurisdiction may, in its discretion, direct the
> reinstatement of the appellant or permit the transfer of such
> appellant to a vacancy in a similar position in another division or
> department, or direct that his name be placed upon a preferred list
> pursuant to section eighty-one of this chapter. In the event that a
> transfer is not effected, the commission is empowered to direct the
> reinstatement of such officer or employee. An employee reinstated
> pursuant to this subdivision shall receive the salary or
> compensation he would have been entitled by law to have received

> in his position for the period of removal including any prior period
> of suspension without pay, less the amount of any unemployment
> insurance benefits he may have received during such period. The
> decision of such civil service commission shall be final and
> conclusive, and not subject to further review in any court.

New York State Civil Service Law § 76.  Inasmuch as Mendez' determination to accept the

hearing officer's recommendation of termination was subject to review and possible reversal

under §76, Mendez's decision to accept the recommendation does not make him a policymaker

for purposes of Monell.

Lastly, the plaintiff contends that the ECWA may be held liable for failing to adequately

train its employees with respect to racial discrimination.  The plaintiff asserts that he did not

receive any policy statements that had instructions to follow relating to racial discrimination.

(Docket No. 71 at ¶23).  The plaintiff also points to the deposition of Ivan Carmichael (Docket

No. 74 at page 9).  At his deposition, Carmichael testified regarding the alleged incident when

Finn, allegedly using racially derogatory language, stated to Matusick that Carmichael was trying

to "steal" Starks.  Carmichael admitted to being upset. (Docket No. 70, Exhibit U at page 21).

He stated that he reported the incident to his general foreman, Guggemos, but was told "it wasn't

my battle." (Docket No. 70, Exhibit U, page 22).  According to Carmichael, when he started at

the ECWA he was told "that whatever happens in the back stays in the back."  (Docket No. 70,

Exhibit U, page 22).  He stated that he was not familiar with the ECWA policy with respect to

discrimination or an harassment complaint. (Docket No. 70, Exhibit U, page 23).  He recalled

being sent to a class regarding "treatment of the women in the workplace ... but there was nothing

as far as racial or diversity."  (Docket No. 70, Exhibit U, page 24).  The defendants have

submitted the ECWA Discrimination Complaint Procedure (Policy No. 6) providing a procedure

for employees who feel that they have been suffered from racial (or other) discrimination. (Docket No. 47, Exhibit 2 & 3). The defendants have also presented the ECWA Employment Opportunity Policy which states a commitment of making employment decisions based upon the principal of equal employment opportunity. (Docket No. 47, Exhibit 4). Finally, the defendants submit various documents reflecting that Carmichael, Marzec, Faircloth, Finn, and Joseph Schichtel received revised policies, including the Discrimination Complaint Procedure, in May of 2005; that Carmichael, Faircloth and Schichtel attended an EEO Law and Harassment Training Program in May of 2005; Bluman attended a similar seminar in November of 2004; and Finn attended "Diversity Awareness Training" in 2007. (Docket No. 76, Exhibit C). These documents do not conclusively establish the adequacy of the ECWA training program with respect to racial diversity and discrimination issues. Indeed, Carmichael's testimony reflects that while he attended a seminar, he did not recall any discussion regarding diversity issues. Based upon this record, questions of fact exist as to whether ECWA employees were adequately trained with respect to policies concerning racial discrimination. Valentin v. New York City,  1997 WL 33323099, at*13 (E.D.N.Y.,1997)(plaintiff has presented sufficient evidence to raise a question of fact as to whether the defendant Housing Police did provide adequate training).

In sum, questions of fact as to whether the alleged discriminatory conduct was sufficiently pervasive to constitute a custom, policy or practice of the ECWA and whether the ECWA adequately trained its employees regarding its racial discrimination policy precludes granting summary judgment in favor of the ECWA or the individual defendants as to plaintiff's §1983 claim based upon the First Amendment.

24

The §296 Discrimination & Retaliation Claims

_____The plaintiff contends that he was subject to disparate treatment and retaliation based upon his May 2005 suspension and his subsequent termination in violation of §296 of the New York State Human Rights Law .  The parties agree that the standards for recovery under §296 are the same as the federal standards under Title VII of the Civil Rights Act of 1964. (Docket No. 74 at page 12).  Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n. 3, 786 N.Y.S.2d 382, 391 n. 3, (2004); Sicular v. N.Y.C. Dept. Of Homeless Services, 2010 WL 423013, 15 (S.D.N.Y.,2010).

To establish a prima facie claim of employment discrimination a plaintiff must demonstrate: (1) that he or she belonged to a protected class; (2) that he or she was otherwise qualified for the position; (3) that he or she suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Pursuant to the burden-shifting analysis outlined in McDonnell, the plaintiff first must establish a *prima facie* case of discrimination based on race. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas, 411 U.S. at 802. If he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. The defendant's burden of production also is not a demanding one; he or she need only offer such an explanation for the employment decision. Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075 (1997). Although the burden of production shifts to the defendant,

25

the ultimate burden of persuasion remains always with the plaintiff. St. Mary's, 509 U.S. at 507,

511.  If the defendant proffers such a  reason, the presumption of discrimination created by the

prima facie case drops out of the analysis, and the defendant "will be entitled to summary

judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of

prohibited discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir.2000) citing

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519-524 (1993); see also McDonnell Douglas, 411

U.S. at 804; Fisher, 114 F.3d. At 1336.The  plaintiff "must be afforded the opportunity to prove

by a preponderance of the evidence that the legitimate reasons offered by the defendant were not

its true reasons but were a pretext for discrimination."  Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 142-43 (2000). The plaintiff need not prove that the defendant's proffered

reason was false, but must demonstrate that discrimination was at least in part a motivating factor

in the defendant's actions. Bickerstaff v. Vassar College, 196 F.3d 435, 447 (2d Cir. 1999); see

also Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir.1995); Sutera v. Schering Corp., 73

F.3d 13, 17 (2d Cir.1995).     In Carlton v. Mystic Transp., Inc.,  2000 WL 95036 (2nd Cir.

2000), the Second Circuit provided further guidance as to this burden:

> At this stage, the burden shifts back to the plaintiff to offer proof
> "through presentation of his own case and through cross-
> examination" that would allow a rational factfinder to conclude
> that the proffered reason was not the true reason for the adverse
> employment action, and that [a discriminatory animus]  was.   To
> meet this burden, the plaintiff may rely "on the evidence
> constituting the prima facie case, together with supportable
> inferences to be drawn from the false or erroneous character of the
> employer's proffered reason for the adverse action." ... **Plaintiff
> need not prove that [a discriminatory animus] was the only or
> even the principal factor in the adverse employment action, but
> only that [a discriminatory animus] was at least one of the
> motivating factors in that decision.** ... Direct evidence of
> discrimination is not necessary, ...  because proof is seldom

available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file. ***Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial. ... Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact.***

Carlton, 2000 WL 95036  *4 (citations omitted)(emphasis added).

The defendants do not dispute that the plaintiff can meet the first three elements of the prima facie test, but contends that the plaintiff cannot establish that any of the defendants' actions occurred under circumstances giving rise to an inference of discrimination. (Docket No. 50 at page 17).

The plaintiff asserts two adverse employment actions as the basis of his claim: (1)the may 2005 suspension for obscuring the surveillance camera in the dispatch office and (2) his termination following the October 2005 charges.

With respect to the May 2005 suspension, the plaintiff admits that he engaged in the conduct for which he was disciplined but argues that other individuals, including Faircloth, were not disciplined for similar conduct.  (Docket No. 74 at page 15).  The plaintiff acknowledges that Marzec was also disciplined for this same conduct, and that this "does harm plaintiff's claim." The plaintiff contends that they had to discipline Marzec because he was shown blocking the camera in the video with Matusick.  (Docket No. 74 at page 17).  The plaintiff suggests although

27

Radich was also disciplined in the same month for the same activity (and received a more harsh penalty), Radich cannot be used to compare to the plaintiff's situation because Radich and Matusick work in different offices and report to different supervisors.  The plaintiff provides no authority supporting that such a distinction is meaningful. The plaintiff does not establish any discriminatory animus related to Radich's suspension. The plaintiff has failed to adequately articulate a basis to distinguish the discipline he received with the discipline received by Marzec and Radich. The plaintiff has failed to establish that the May 2005 suspension occurred under circumstances giving rise to an inference of discrimination.  Summary judgment is appropriate with respect to the plaintiff's claim that his suspension in May of 2005 constituted disparate treatment.

To the extent the plaintiff claims his termination constitutes disparate treatment, the defendants contend that the plaintiff is collaterally estopped based upon the fact that these issues were previously litigated in the plaintiff's §75 administrative hearing and the § 76 appeal.[21]  It is not clear from the record that there is an identity of issues between the administrative proceedings and the instant matter.  The report of the hearing officer focuses solely on the issues raised in the formal charge and does not discuss the plaintiff's claim that he was subject to disparate treatment due to his relationship with Starks.  Further, the record reflects that Matusick was not represented by counsel at the administrative hearing. (Docket No. 47, Exhibit 18).  The record does not establish that Matusick had a full and fair opportunity to litigate the issue presented in this action.

---

[21]   Section 76(3) of the New York State Civil Service Law states: "The decision of such civil service commission shall be final and conclusive, **and not subject to further review in any court.**" (Emphasis added).

28

The plaintiff contends that the charges upon which his termination was based were brought against him, and not other ECWA employees because of his relationship with Starks. In this regard, as discussed above, the record reflects that Matusick was not the only ECWA employee to fall asleep during the night shift. Further, the plaintiff contends that no other ECWA dispatcher had ever been disciplined or terminated based upon a slow response to calls concerning a possible leak.  This is supported by the testimony of Fessari, a retired ECWA dispatcher, and does not appear to be refuted by the defendants.  In light of the plaintiff's burden as set forth in Carlson, the plaintiff has sufficiently articulate a basis that would allow a rational factfinder to conclude that the proffered reason for Matusic's termination was not the true reason, and that his relationship with Starks was at least one of the motivating factors explaining why Matusick, and apparently no other ECWA employee, was subjected to the charges which eventually led to his termination.  This precludes the grant of summary judgment in favor of the defendants with respect to the plaintiff's claim that he was subject to disparate treatment.


The Hostile Work Environment Claim

The plaintiff also asserts that he was the victim of a hostile work environment.  To establish a *prima facie* case of discrimination due to a hostile work environment, a plaintiff must show [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997) (internal citations and quotation marks omitted). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule,

and insult that the terms and conditions of his employment were thereby altered. Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir.2001) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999). This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). With respect to the first element, the Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law. Richardson, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)); Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997).  Isolated incidents rarely meet this standard. Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir.2004) (noting that "isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment") (citation omitted); Alfano v. Costello, 294 F.3d 365, 380 (2d Cir.2002) (finding the alleged conduct non-actionable when the incidents were "too few, too separate in time, and too mild ... to create an abusive working environment"). The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, ... [t]he environment need not be 'unendurable' or 'intolerable.'" Feingold v. New York, 366 F.3d 138, 150 (2d Cir.2004) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir.2000)).

As discussed above, the plaintiff has identified *fourteen* ECWA employees who have allegedly made racially charged remarks directly to him on virtually a daily basis over the period from July 2004 to October 2005 and eight additional ECWA employees as regularly referring to African American employees at the ECWA in racially derogatory terms. (Docket No. 71 at ¶ 21). The plaintiff claims that Bluman and Finn made racial remarks to him at least three time a week throughout this period and that he was physically assaulted or intimidated by these individuals. (Docket No. 71 at ¶¶ 10, 16). The plaintiff alleges that he brought this conduct to the attention of his superiors at the ECWA on at least six occasions. (Docket Nos. 71 at ¶¶ 9, 17 and 26; Docket No. 83 at ¶ 6). Matusick states that he feared having to work with Bluman based upon his racially motivated remarks. (Docket No. 71 at ¶¶ 9(a-c), 10). This conduct, if accepted by a trier of fact, is sufficiently pervasive as to alter the conditions of the plaintiff's employment and create an abusive working environment. The motion for summary judgment on this claim should be denied.

State Tort Claims

The first cause of action in the complaint is asserted only as to defendant Bluman and alleges that Bluman "did negligently and carelessly commit a physical assault and battery upon the person of the plaintiff." (Complaint at ¶ 48). The alleged incident took place on July 2, 2004. By way of the sixth cause of action, the plaintiff asserts a claim of intentional infliction of emotional distress as of the date of his termination [April 24, 2006]. (Complaint at ¶ 67). These state claims are subject to a one-year statute of limitations. C.P.L.R. 215(3). The plaintiff does not dispute that the instant action was not commenced within one year of the underlying dates.

31

These claims should be dismissed as barred by the applicable statute of limitations.

**Conclusion**

Based on the above, it is recommended that the defendants' motion for summary judgment be granted in part and denied in part consistent with the above.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not,

presented to the Magistrate Judge in the first instance.  See <u>Patterson-Leitch Co. Inc. v.</u>

<u>Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written

objections shall specifically identify the portions of the proposed findings and recommendations

to which objection is made and the basis for such objection and shall be supported by legal

authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District**

**Court's refusal to consider the objection.**

So Ordered.


_/s/ Hugh B. Scott_

_____   United States Magistrate Judge
_____   Western District of New York

Buffalo, New York
February 22, 2010


33