UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

════════════════════════════

SCOTT M. MATUSICK,

                              Plaintiff,

                                                    **DECISION AND ORDER**
          v.                                        07-CV-489A

ERIE COUNTY WATER AUTHORITY,
ROBERT MENDEZ,
GARY BLUMAN,
JOHN KURYAK, and
JAMES P. LISINSKI,

                              Defendants.[1]

════════════════════════════

## I.    INTRODUCTION

        Pending before the Court are several post-trial motions that the parties

filed after a jury returned a verdict for plaintiff on September 1, 2010 for his

claims of unlawful termination, a hostile work environment, and a federal civil-

rights violation.  Defendants, who consist of plaintiff's former employer and

several of his former supervisors and co-workers, have filed motions for

judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil

─────────────────

        [1] For the sake of brevity, the Court notes generally that the defendants
listed here are sued in their individual and official capacities as noted in the
docket.  The Clerk of the Court is directed to amend the official caption to note
that defendants David P. Jaros, Karla Thomas, Helen Cullinan Szvoren,
Matthew J. Baudo, and Robert Guggemos were dismissed previously.

Procedure ("FRCP") and for a correction of the final judgment filed on September 7, 2010, should that judgment survive the FRCP 50(b) motion. Meanwhile, plaintiff has filed motions for pre- and post-judgment interest, a bill of costs, and attorney fees.

The parties appeared before the Court on February 1, 2011 for oral argument on all of the pending motions. On that day, defense counsel appeared and attempted to proceed with oral argument but was hampered by severe laryngitis. After initially asking whether counsel would be interested in rescheduling oral argument, the Court concluded that it was sufficiently familiar with the issues raised and the papers filed that it would deem all of the motions submitted on papers pursuant to FRCP 78(b). For the reasons below, the Court denies defendants' FRCP 50(b) motion; grants defendants' motion for correction of the judgment; and awards plaintiff interest, partial attorney fees, and partial costs.

## II.  BACKGROUND

For the sake of clarity and organization, the Court will address the arguments behind each pending motion separately. The Court also will presume familiarity with the factual details that the parties have litigated extensively so far. In general, however, this case and the pending motions concerned plaintiff's allegations that defendants harassed him, retaliated against him, and ultimately fired him because they did not like that his then-girlfriend (now wife) was black.

Plaintiff, who is white, began working for defendant the Erie County Water Authority ("ECWA") as a junior customer service representative in 1992. After some time spent in that position, plaintiff became a customer service representative and later a bill collector. Within a few years, plaintiff was working at ECWA as a dispatcher, the position that he held until his termination on April 7, 2006. Around May 2004, plaintiff started dating Anita Starks ("Anita") and formed a relationship with her and her two children. Plaintiff alleged that Anita and her children would come to his place of employment from time to time, and that his supervisors and co-workers thus had an opportunity to know that he had started an interracial relationship. Not long after he began his relationship with Anita, plaintiff allegedly became a regular target of racial slurs and racially derogatory remarks that referred to him, Anita, and Anita's children. The remarks repeatedly referred to plaintiff as a "nigger lover" who associated with a "nigger bitch" and her "niglettes." Plaintiff's experiences with racial harassment allegedly included a physical assault from co-worker Gary Bluman on July 2, 2004. Plaintiff alleged that when he complained to supervisors about the harassment, the supervisors refused to take appropriate action to address his complaints, and at least once suggested that his complaints were a disruptive influence in the ECWA work environment. Additionally, the harassment allegedly continued partly in retaliation for plaintiff's decision to complain in the first place.

A critical part of plaintiff's allegations was that the racial hostility that defendants demonstrated against him motivated them to push through a disciplinary hearing process in the fall of 2005 in a way that they had not pursued for other employees. Plaintiff himself has acknowledged that he had a disciplinary history when he worked for ECWA. Among other incidents, plaintiff was disciplined in April 2005 for blocking the view of a camera installed in the dispatch office to enhance security but also used to ensure that dispatchers did not sleep on the job. In October 2005, plaintiff was observed sleeping on duty once and allegedly mishandled two telephone calls reporting water line breaks. The October 2005 incidents led to a formal hearing under Section 75 of New York's Civil Service Law, which in turn led to a recommendation that plaintiff be terminated. Plaintiff was formally terminated on April 24, 2006. When addressing his disciplinary history in his allegations, plaintiff did not necessarily challenge each incident. Rather, plaintiff alleged that co-workers who engaged in similar conduct never faced Section 75 hearings, and that any discipline handed to him for the October 2005 incidents would have been less severe but for the ongoing racial hostility against him.

The racial harassment that plaintiff allegedly experienced prompted him to commence this case in state court on June 26, 2007. The complaint originally contained six claims. The first claim was for common-law assault against Gary Bluman for the alleged incident of July 2, 2004. The second claim was against

all defendants for a hostile work environment in violation of New York's Human

Rights Law, found at N.Y. Executive Law § 296.  The third claim was against all

defendants for disparate treatment in violation of the Human Rights Law.  The

fourth claim was against all defendants for retaliation in violation of the Human

Rights Law.  The fifth claim was against all defendants for unlawful infringement

of plaintiff's First Amendment right to intimate association, in violation of 42

U.S.C. § 1983.  The sixth claim was against all defendants for common-law

intentional infliction of emotional distress.  Defendants filed a notice of removal

to this Court on July 27, 2007.  After discovery, defendants filed a motion for

summary judgment on May 11, 2009.  By order dated June 11, 2010, this Court

granted defendants' motion with respect to plaintiff's first and sixth claims but

otherwise denied the motion.[2]  On August 11, 2010, defendants filed a motion

for reconsideration of the Court's summary judgment decision, claiming that the

decision did not address their legal argument in favor of qualified immunity.

Defendants' argument for qualified immunity as a matter of law was that the First

Amendment right to intimate association was not clearly established for dating,

as opposed to married, relationships when their alleged acts occurred.  The

Court denied the motion for reconsideration from the bench on August 18, 2010.

---

[2] The Court adopted a Report and Recommendation issued by Magistrate
Judge Hugh B. Scott.

Plaintiff's allegations proceeded to trial in late August 2010. At the close of proof, defendants made their initial motion for judgment as a matter of law under FRCP 50. The Court granted that motion with respect to individual defendants Jaros, Thomas, Szvoren, Baudo, and Guggemos, and with respect to a few of the claims against defendants Mendez and Bluman; but denied the motion with respect to ECWA, the remaining claims against defendants Mendez and Bluman, and all of the claims against defendants Kuryak and Lisinski. On September 1, 2010, the jury returned a verdict finding defendants ECWA, Kuryak, and Lisinski liable on plaintiff's claim of unlawful termination; finding defendants ECWA, Bluman, Kuryak, and Lisinski liable on plaintiff's claim of a hostile work environment; finding no cause of action on plaintiff's claim of unlawful retaliation; and finding defendants ECWA, Mendez, Bluman, Kuryak, and Lisinski liable on plaintiff's claim of a Section 1983 violation. With respect to damages, the jury declined to award compensatory damages for non-economic losses but awarded $304,775 in back pay. The jury declined to award any damages for lost future earnings. The jury also assessed $5,000 of punitive damages against each of the individual defendants for plaintiff's Section 1983 claim.

## III.    DISCUSSION

### A.    *Defendants' Motion Under FRCP 50(b)*

Defendants have renewed their motion for judgment as a matter of law with respect to plaintiff's claims for unlawful termination and a Section 1983 violation, the two claims for which the jury awarded damages.  FRCP 50(b) permits parties to "file a renewed motion for judgment as a matter of law" after entry of judgment.  Generally, the standard of review under FRCP 50 is highly deferential to the non-moving party and limits the scope of the reviewing court's analysis.  "In ruling on a motion for judgment as a matter of law, trial courts are required to consider the evidence in the light most favorable to the nonmovant and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.  The Court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.  In making its evaluation, the Court should review all of the evidence in the record, but it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the Court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  *Obabueki v. Choicepoint, Inc.*, 236 F. Supp. 2d 278, 282 (S.D.N.Y. 2002) (internal quotation marks and citations omitted).  The Court will assess below

how this deferential standard applies to each argument that defendants have advanced.

### 1.  *Plaintiff's Unlawful Termination Claim*

Defendants contend that the jury's verdict in favor of plaintiff on his unlawful-termination claim cannot stand as to either ECWA or any individual defendant.  In support of their contention, defendants assert that plaintiff cannot compare himself to other employees because his disciplinary history was different and because he declined an invitation to settle the charges that led to his Section 75 hearing.  Defendants assert also that the race of plaintiff's then-girlfriend was not a motivating factor behind plaintiff's termination because the weight of the evidence indicates that no one in a position to make or to contribute to the decision to terminate knew about the relationship.  Defendants assert further that the principle of collateral estoppel applies to the recommendation by the Section 75 hearing officer to terminate plaintiff, thus precluding plaintiff from what defendants consider to have been the re-litigation of plaintiff's termination at trial.  Alternatively, defendants assert that the findings from that hearing are entitled to controlling weight.  Finally, defendants assert that no evidence emerged at trial indicating that any individual defendant aided and abetted an unlawful termination, conduct that would have been required to find individual liability under the Human Rights Law.

In opposition to defendants' argument, plaintiff generally points to the evidence elicited at trial indicating that plaintiff did receive more severe discipline for the same conduct than similarly situated co-workers. Further, plaintiff notes that evidence emerged at trial indicating that a conscious racial animus permeated his relationship with his employer and unavoidably altered any decisions that his employer made about him. Finally, plaintiff contends, as he did in opposition to nearly identical arguments made during motions *in limine*, that the recommendations of the hearing officer who conducted plaintiff's Section 75 hearing are not entitled to controlling weight and did not implicate principles of collateral estoppel.

"Under New York law, a state agency determination is given preclusive effect in a subsequent state court proceedings only when, *inter alia*, the identical issue has been decided in the prior action." *Leventhal v. Knapek*, 266 F.3d 64, 72 (2d Cir. 2001) (internal quotation marks and citations omitted). Here, plaintiff's Section 75 hearing led only to non-binding recommendations regarding plaintiff's termination. The hearing officer himself had no authority to terminate plaintiff. No matter how detailed or how "strong" the recommendations were, the ultimate decision to terminate plaintiff rested entirely and exclusively with ECWA and its officials. *Cf. id.* ("In this case, the hearing officer's conclusion that [plaintiff's] Fourth Amendment rights were violated does not have preclusive effect because the issue was not 'decided' in the agency proceeding . . . . Even if

the hearing officer were to have completed taking the evidence and had offered recommendations, only the DOT Commissioner can make the agency determination.") (citation omitted).  Under these circumstances, there is no reason to overlook evidence that race was a motivating factor behind plaintiff's termination simply because plaintiff's supervisors chose voluntarily to endorse recommendations that suggested otherwise.

As for plaintiff's evidence that race was a motivating factor behind his termination, the Court is concerned that defendants' remaining arguments are simply an invitation to disbelieve plaintiff and to believe other witnesses.  (*See, e.g.*, Dkt. No. 189-1 at 18 (introducing nine bullet points about trial testimony by contending that "the undisputed evidence shows that the race of the plaintiff's girlfriend played absolutely no role in the ECWA's decision to terminate his employment").)  As the Court noted above, the type of crediting and discrediting of evidence that defendants seek is not appropriate in the context of a motion under FRCP 50(b).  *Cf., e.g., Veerman v. Deep Blue Group LLC*, No. 08 Civ. 5042, 2010 WL 4449067, at *5 (S.D.N.Y. Nov. 3, 2010) ("Defendants then cite evidence in an effort to show that the jury couldn't reasonably have found [defendants] committed harassing acts with malice.  But as with their other evidence-based arguments, these fail.  The jury is not required to accept [defendants'], and could reasonably have believed [plaintiffs'] testimony that they were the recipients of repeated [unlawful conduct].").  Viewing the evidence in

10

the light most favorable to plaintiff, plaintiff submitted evidence acceptable to a reasonable jury that defendants—directly or by aiding and abetting—terminated plaintiff and disciplined him more harshly than they would have otherwise because of animosity toward his interracial relationship. *Cf. Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("In proving a case under Title VII, following the defendant's proffer of a justification, a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus . . . . A plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally furnishing a justification known to be false. The crucial element of a claim under Title VII is discrimination, not dishonesty.") (citations omitted). Defendants' motion thus fails with respect to plaintiff's claim of unlawful termination.

### 2. *Plaintiff's Section 1983 Claim Generally*

Defendants contend that the jury's verdict in favor of plaintiff on his Section 1983 claim cannot stand as to either ECWA or any of the individual defendants found liable. Defendants assert that plaintiff failed to establish that any alleged conduct occurred under color of state law. In an argument made for the first time, defendants assert further that plaintiff failed to establish that any the individual defendants affirmatively acted in a way to establish Section 1983 liability. To the extent that plaintiff offered any evidence of any action or failure to act, defendants assert that such evidence is legally insufficient to sustain a

11

Section 1983 claim.  Because none of the individual defendants can be found liable, according to defendants, ECWA cannot be found liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Plaintiff offers several arguments in opposition to defendants' arguments about Section 1983 liability.  Plaintiff notes that evidence presented at trial indicated that ECWA, through its officials, consciously chose to ignore plaintiff's complaints and instead labeled him as the disruptive force in the ECWA work environment.  Plaintiff counters further that at least one of his supervisors personally participated in the use of racial slurs.  Finally, plaintiff contends that the decision to commence termination proceedings less than two weeks after he complained about a hostile work environment constitutes "direct action" that supports the jury's finding of Section 1983 liability.

In reviewing defendants' arguments against any finding of Section 1983 liability, the Court is concerned that defendants have overlooked the evidence that emerged at trial in pursuit of a technical and unsettled legal point.  "In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009); *see also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged

12

constitutional deprivations is a prerequisite to an award of damages under §
1983.") (internal quotation marks and citations omitted); *Kleehammer v. Monroe
County*, No. 09-CV-6177, 2010 WL 4053943, at *8 (W.D.N.Y. Sept. 8, 2010)
(Siragusa, *J.*) ("Thus, in order to plausibly plead a claim against the County and
Sheriff O'Flynn, Plaintiff must allege either that O'Flynn, the Monroe County
Sheriff, had a hand in the alleged constitutional violation, or created a policy or
custom under which the unconstitutional practices occurred.").  Here, a
reasonable jury could have credited the evidence that the individual defendants
actively participated in racial slurs and actively cast plaintiff, and not themselves,
as a disruptive member of the ECWA workforce because he complained about
racial harassment.  Further, a reasonable jury could have credited the evidence
that the individual defendants actively declined to respect plaintiff's complaints,
thereby creating the type of custom and practice within ECWA that supports
liability under *Monell*.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130
(1988) ("It would be a different matter if a particular decision by a subordinate
was cast in the form of a policy statement and expressly approved by the
supervising policymaker.  It would also be a different matter if a series of
decisions by a subordinate official manifested a 'custom or usage' of which the
supervisor must have been aware.  In both those cases, the supervisor could
realistically be deemed to have adopted a policy that happened to have been
formulated or initiated by a lower-ranking official.").  In short, then, the jury's

finding of Section 1983 liability flowed from a reasonable factual determination that defendants actively hastened plaintiff's termination because of animosity toward his interracial relationship.

Defendants' argument that *Iqbal* eliminated some of the ways in which *Colon* allowed plaintiffs to prove Section 1983 liability does not require a different conclusion but warrants a brief comment. Under *Colon*, plaintiffs could establish the personal involvement needed to prove Section 1983 liability in five different ways. "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873 (citation omitted). Given that the immediately preceding sentence in *Colon* establishes personal involvement as the only way to create Section 1983 liability, the most natural way to read that sentence and the five methods of proving liability that follow is to interpret all five methods as methods for proving direct personal involvement. This reading also makes sense

because all five methods of proving liability in *Colon* require proving some level of active decision-making, even if the decision were an active decision to ignore complaints. That type of active decision-making elevates the five methods in *Colon* above the passive nature of liability under the theory of *respondeat superior*. *See Restatement (Third) of Agency* § 2.04 (2006) ("Most often the doctrine [of *respondeat superior*] applies to acts that have not been specifically directed by an employer but that are the consequence of inattentiveness or poor judgment on the part of an employee acting within the job description."). Under this reading of *Colon*, then, the holding from *Iqbal* that government officials are responsible only for their own misconduct had no impact on the possibility that misconduct can result from an active, conscious decision to ignore complaints and to allow racial harassment to continue. *But see Kleehammer*, 2010 WL 4053943, at *8 (holding that *Iqbal* left only the first and part of the third methods under *Colon* intact) (citing *Bellamy v. Mt. Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939 (S.D.N.Y. Jun. 26, 2009)). Accordingly, the Court rejects defendants' general arguments about Section 1983 liability.

### 3. *Qualified Immunity*

Apart from their general arguments about Section 1983 liability, defendants once again submit an argument for qualified immunity, an argument that dovetails with their repeated argument that the First Amendment right to

intimate association does not cover family-like dating relationships.[3]  Defendants

assert that they performed the following discretionary government functions that

deserve qualified immunity from any liability for the use of racial slurs against

girlfriends: 1) "assigning the plaintiff work and criticizing his failure to perform"; 2)

"investigating the plaintiff's 'complaint'"; 3) "conducting an investigation of the

plaintiff's misconduct and failure to perform job duties"; 4) "drafting the plaintiff's

Section 75 charges and participating in the hearing"; and 5) "terminating the

plaintiff's employment."  (Dkt. No. 189-1 at 33–34.)  Defendants' argument for

qualified immunity evolved during and after trial, compared to the following

exchange that occurred on the eve of trial:

> THE COURT: So the intimate relationship we have here, racial slurs
> would be okay because it's part of a governmental function, I
> guess, because that's what—[if] you want qualified immunity it
> would have to be part of a governmental function.
>
> So what's the governmental function that you're
> trying to protect, racial slurs?
>
> [COUNSEL]: We're not looking at the racial slurs.  What we're
> looking at is the operation of [a] municipal entity.  They
> employed the plaintiff.
>
> THE COURT: Yeah, but we're talking about constitutional rights that
> may have been violated by using these racial slurs.  That's
> what this case is all about, as I understand it.

---

[3] The Court addressed defendants' argument about First Amendment
rights when it denied their motion for reconsideration on August 18, 2010.  (*See*
Dkt. No. 167 at 14–19.)

[COUNSEL]: Your Honor, I think by analogy—

THE COURT: I got it.  Now, I understand it.  Operating the Water
　　　　　Authority requires, mandates racial slurs, that's the
　　　　　governmental function.  You can't be serious.

[COUNSEL]: I'm deadly serious, Your Honor.

(Dkt. No. 167 at 12.)

Plaintiff opposes any granting of qualified immunity because he contends

that defendants are making too technical of a distinction between a dating

relationship and a marriage relationship.  Plaintiff contends, as this Court found

when addressing the issue before trial, that the Supreme Court made clear a

generation ago that the family-like qualities of a relationship matter more than

technical categorization when assessing First Amendment protection.  Plaintiff

contends further that sufficient evidence emerged before and during trial to

conclude that, during the times relevant to this case, plaintiff and his then-

girlfriend had enough family-like features in their relationship to make clear to

defendants that interference with that relationship on racial grounds would

constitute a First Amendment violation.  Defendants are not disputing the factual

nature of plaintiff's relationship, especially since they declined a pre-trial hearing

on the matter.  (*See id.* at 10:23–11:7.)

Defendants' argument for qualified immunity is the most difficult one to

understand, because they never identified what they were doing that required

qualified immunity for racial slurs.  "[G]overnment officials performing

17

discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  To determine whether a right is clearly established, we look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful.  Even if this or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other courts clearly foreshadow a particular ruling on the issue, even if those decisions come from courts in other circuits."  *Scott v. Fischer*, 616 F.3d 100, 2010 WL 2991085, at *4 (2d Cir. Aug. 2, 2010) (alteration in original) (internal quotation marks and citations omitted).  As *Scott* indicates, the very first step in assessing a claim for qualified immunity is to identify the discretionary governmental function that required the conduct that a plaintiff claims to be improper.  As defendants themselves have identified, a common example of a scenario involving qualified immunity is a prisoner's Eighth Amendment case alleging excessive force by prison guards.  In that scenario, maintaining order in a prison—by force if necessary—is the governmental function in question.  *Cf., e.g., Whitley v. Albers*, 475 U.S. 312, 321–22 (1986)

("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.") (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)) (ellipsis in original). When prison guards apply force to an inmate to uphold their governmental function, they receive qualified immunity from liability if existing case law at the time of the incident authorized the particular manner and circumstances in which they applied force. Critical to the prison analogy—and to qualified immunity cases in general—is that the governmental conduct that is allegedly improper has to match the governmental function that would receive immunity from liability.

Attempting to match governmental conduct and governmental function in this case reveals that defendants' argument for qualified immunity makes no sense. The conduct that prompted plaintiff's lawsuit was physical, verbal, and administrative hostility toward someone derided as a "nigger lover" who was dating a "nigger bitch" and spending time with her "niglettes." What governmental function at a county water authority could possibly require such language? *See Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1953 (2009) ("The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery' . . . . Litigation, though necessary to ensure that officials comply with the law, exacts

heavy costs in terms of efficiency and expenditure of valuable time and

resources that might otherwise be directed to *the proper execution of the work of*

*the Government*.") (citation omitted) (emphasis added); *cf. Bryant v. Jones*, 575

F.3d 1281, 1300 (11th Cir. 2009) ("We have often noted the patently obvious

illegality of racial discrimination in public employment.") (internal quotation marks

and citations omitted); *Buckley v. Gomez*, 168 F.3d 498, 1999 WL 47401, at *1

(9th Cir. Jan. 4, 1999) (table case) ("The slurs provided enough evidence of

animus to permit the claim of discriminatory conduct to survive summary

judgment and to preclude qualified immunity. A reasonable officer would know

that racial discrimination violates [plaintiff's] clearly established rights.") (citations

omitted). For a while, defendants were "deadly serious" that ECWA could not

"operate"—which presumably means that it could not deliver water to residents

of Erie County—without using such language in reference to girlfriends, but not

wives. (*See* Dkt. No. 167 at 6 ("THE COURT: Let's say [that Anita was] his wife

at the time, would that make any difference? [COUNSEL]: Yes, it would, Your

Honor. It would make a great deal of difference.").) The Court rejects that

argument on its face and without further comment. At trial and now, defendants

tried a different approach to qualified immunity, suggesting that the

governmental function in question was the ability of human-resource

administrators to terminate bad employees. This approach fares no better

because it confuses pre-violation governmental conduct with post-violation

20

conduct.  Defendants did not use racial slurs against plaintiff because they needed to investigate whether he fell asleep on the job and whether he mishandled telephone calls.  They used the racial slurs that they used—and commenced final disciplinary proceedings in part—because they disliked his interracial relationship.  Any actions by human-resource officials that occurred once plaintiff's claims accrued are irrelevant in trying to determine what the governmental function in question was.  Qualified immunity requires identifying some duty or purpose of ECWA that ECWA could not accomplish without the use of racial slurs against girlfriends.  Under the circumstances of this case, this Court finds that no such identification is possible, meaning that defendants' request for qualified immunity is denied without reaching the factors enumerated in *Scott*.

### 4.   *Punitive Damages*

Because the Court has upheld the jury's verdict regarding plaintiff's Section 1983 claim, it will consider defendants' argument about punitive damages.  Defendants assert that their decision to terminate plaintiff was reasonable under the circumstances and cannot be considered extreme or outrageous, as would be necessary for a finding of punitive damages. Defendants have not cited any legal authorities to make any argument that an award of punitive damages in this case would be legally erroneous.  Rather, defendants have made a factual argument that "there is no legally sufficient

proof to establish that any of the individual defendants took the direct action required to support any liability under Section 1983, and there is certainly no evidence of 'extreme or outrageous conduct.'" (Dkt. No. 189-1 at 38.)  Plaintiff opposes defendants' argument by contending generally that the evidence at trial supported a finding of Section 1983 liability and of extreme or outrageous conduct, meaning that the Court should not disturb this aspect of the verdict.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  "The Supreme Court has recently identified three 'guideposts' that bear on the reasonableness of punitive damages awards, at least the outer limits imposed by the Due Process Clause.  We have recently looked to these guideposts to assist us in the application of our standard, by which we deem excessive a punitive damage award that shocks our judicial conscience.  These guideposts are: (1) the degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  *Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir. 1997) (internal quotation marks and citations omitted).  Here, a reasonable jury could have decided based on the evidence that defendants were liable under Section 1983 for intentional racial

harassment designed to punish plaintiff for his interracial relationship. The evidence included usage of any number of racial slurs over a prolonged period of time, intentional decisions to ignore plaintiff's complaints about harassment, and intentional decisions to commence proceedings to hasten plaintiff's termination and thus to eliminate his supposedly disruptive influence on the work environment. In the face of this evidence, the jury assessed each individual defendant only $5,000 in punitive damages. The aggregate punitive damages award was only a fraction of the backpay award that plaintiff received. Under these circumstances, the jury's decision to award punitive damages was reasonable, as was the amount awarded. The Court thus rejects defendants' argument about punitive damages.

**B.** ***Defendants' Motion to Revise the Judgment***

Defendants have made a motion to strike language from the sixth clause of the judgment that the Clerk of the Court filed on September 7, 2010. The sixth clause of the judgment reads as follows: "the Jury finds that Pltf was fired because of race discrimination or because of intent to retaliate and awards Pltf compensatory damages for lost prior earnings in the amount of $304,775.00." (Dkt. No. 172.) Defendants want the Court to strike the phrase "or because of intent to retaliate" to reflect that the jury rejected plaintiff's retaliation claim. Plaintiff contends that the judgment's language is accurate.

Although the Court considers the language in the judgment technically correct, it will grant defendants' motion to avoid any confusion. The confusion that prompted defendants' motion stemmed from an instruction to the jury in the verdict sheet regarding when the jury could proceed to consider damages for back pay and future pay. Out of the claims that plaintiff made, only the wrongful termination and retaliation claims would have opened the door to consideration of back pay and future pay. Accordingly, Questions 6 and 7 on the verdict sheet, which addressed damages for back pay and future pay, followed this instruction: "If you have found that plaintiff was fired because of race discrimination or because of an intent to retaliate, proceed to Question 6. Otherwise, proceed to Question 8." (Dkt. No. 171 at 4.) The Clerk of the Court appears to have copied this instruction when writing the sixth clause of the judgment. As a matter of literal logic, the sixth clause of the judgment is correct: Upon a finding of either wrongful termination *or* retaliation, the jury could consider back pay and future pay; one of those findings occurred; and the judgment simply restates, without specifying, that the jury met at least one of the prerequisites for a determination of back pay and future pay. Nonetheless, defendants' concern about confusion is understandable. Literal logic aside, the sixth clause of the judgment may suggest that a finding of unlawful retaliation occurred. To avoid any confusion, the Court directs that any clause in the new final judgment announcing the

award for back pay shall state that the basis for the back pay award was unlawful termination only.

### C. *Plaintiff's Motion for Pre- and Post-Judgment Interest*

Plaintiff has asked the Court to apply both pre- and post-judgment interest to the jury award. With respect to pre-judgment interest, plaintiff has asked the court to apply the 9% statutory rate set by N.Y. C.P.L.R. ("CPLR") 5004. In support of his argument, plaintiff has proposed beginning pre-judgment interest on November 8, 2005, when he was suspended without pay, and ending on September 7, 2010, when the Clerk of the Court entered judgment. Plaintiff has proposed further a mathematical calculation that would start from the judgment amount of $304,775, apply interest on a monthly basis over the 58-month interval between the suspension and the judgment, and lead to a total of $79,873 in pre-judgment interest. As for post-judgment interest, plaintiff proposes using the statutory rate set in 28 U.S.C. § 1961 and running that interest from September 7, 2010 until the judgment is paid.

Defendants oppose plaintiff's motion for two reasons. First, defendants reason that the jury must have awarded interest already. Plaintiff's own economics expert testified that plaintiff's gross back pay, starting from the date of his termination and not his suspension without pay, totaled $335,776. Plaintiff's expert testified further that plaintiff earned $150,202 in actual earnings since his termination, meaning that his net or non-mitigated back pay was

$185,574. According to defendants, if the jury went ahead and awarded $304,775 in back pay—a little over 90% of the gross total—then it must have included pre-judgment interest in its computation. Second, and in the alternative, defendants argue that if the Court wishes to award pre-judgment interest then it should start from a back pay award of $185,574—the net amount proposed by plaintiff's own expert and the only amount supported by the evidence—and apply interest as specified in 28 U.S.C. § 1961, not CPLR 5004.

Before deciding any issues associated with interest, the Court must examine what the appropriate principal should be since part of defendants' argument essentially is a motion for remittitur. "Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award." *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027 (2d Cir. 1991) (internal quotation marks and citation omitted). Since the jury awarded back pay under the Human Rights Law, the standard for ordering remittitur is whether the award of back pay "deviates materially from what would be reasonable compensation." CPLR 5501(c); *see also Cross v. N.Y. City Trans. Auth.*, 417 F.3d 241, 258 (2d Cir. 2005) ("The . . . damages at issue were awarded pursuant to plaintiffs' pendant state law claims. Thus, the district court was obliged to review the award under New York law.") (citation omitted). Here, the jury was told at trial what the gross maximum amount of back pay was, and

26

what evidence of mitigation to consider.  The jury took the mitigation evidence partially, but not wholly, into account, and decided on an award of back pay that did not exceed the gross maximum.  *Cf. Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1190 (2d Cir. 1992) ("While the jury's award of $310,000 in back pay was slightly higher than the plaintiff's expert's calculation of $266,106, it does not shock the conscience, nor does it deviate substantially from what would be reasonable compensation; thus, there is no basis for us to disturb that award."). Given that "[i]t is well settled that calculation of damages is the province of the jury," *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990), the Court finds that the jury did not act unreasonably in setting the award of back pay at $304,775, which will serve as the principal for any calculations of interest.

Having determined the principal in question here, the Court next will review whether to assess pre-judgment interest.  "The Court has discretion to award pre-judgment interest on back pay awarded under the New York Human Rights Law.  Pre-judgment interest prevents the defendant employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages, and helps to ensure that the plaintiff is meaningfully made whole." *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 486 (S.D.N.Y. 2001) (internal quotation marks and citations omitted).  Here, the Court finds that pre-judgment interest of some kind is appropriate to compensate plaintiff for the time value of the back pay that the jury determined that he should have received.

27

Even defendants implicitly have consented to some kind of interest award, apart from their general argument that plaintiff should not receive damages at all. Accordingly, the Court will proceed to calculate interest based on the principal of $304,775.

As for how to assess pre-judgment interest, "New York courts apply the New York statutory rate of interest to calculate pre-judgment interest for employment discrimination back pay verdicts decided under the New York Human Rights Law." *Id.* (citations omitted); *see also Insinga v. Cooperatieve Centrale Raiffeisen Boerenleenbank B.A.*, 478 F. Supp. 2d 508, 512 (S.D.N.Y. 2007) ("The Court agrees with plaintiff that the interest rate mandated by the laws of New York applies in this case because defendant's liability was determined under the New York City Human Rights Law . . . .") (citations omitted). New York's statutory rate of interest is 9% per annum, simple interest. *See* CPLR 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."). The procedure for computing interest under CPLR Article 50 is straightforward. "Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." CPLR 5001(b).

28

"Accordingly, where damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994) (citation omitted). The use of a reasonable intermediate date will be important here, because plaintiff's back pay would have accrued at each pay period that he missed after his termination. The Court decides, then, to use a reasonable intermediate date defined as the halfway point between plaintiff's termination and the judgment entered after the jury verdict. *Cf. Liberty Mut. Ins. Co. v. Fast Lane Car Serv., Inc.*, 681 F. Supp. 2d 340, 351 (E.D.N.Y. 2010) ("Since [defendant's] policy was in effect from May 5, 2005 until August 27, 2005, a reasonable intermediate date would be halfway between the start and end dates of the policy, or July 1, 2005."). To find that reasonable intermediate date, the Court notes that plaintiff was formally terminated on April 24, 2006. Judgment was entered on September 7, 2010. The interval between those two dates, including the date of judgment in itself, spanned 1,598 days. Cutting that interval in half yields an interval of 799 days, commencing on July 1, 2008. Pre-judgment interest thus will cover an interval of 799 days from July 1, 2008 through September 7, 2010.

Accordingly, New York law governing pre-judgment interest guides the Court's calculations as follows. Simple interest equals the principal times the periodic interest rate times the number of periods. The principal here is

$304,775.  The periodic interest rate is the 9% annual rate (0.09) divided by 365 to arrive at a daily rate of 0.02466% (0.0002466).  The number of periods is 799, reflecting the 799 days that elapsed from the reasonable intermediate date of July 1, 2008 through September 7, 2010.  The total pre-judgment interest to be awarded thus equals

$$\$304,775 \times 0.0002466 \times 799 = \mathbf{\$60,050.85}$$

and the total back pay award due to plaintiff as of September 7, 2010 equals

$$\$304,775 + \$60,050.85 = \underline{\mathbf{\$364,825.85.}}$$

The final step in ruling on plaintiff's motion concerns post-judgment interest.  "Interest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  "Postjudgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment."  *Andrulonis v. U.S.*, 26 F.3d 1224, 1230 (2d Cir. 1994) (citations omitted).  The time of reduction to an enforceable judgment means the date when a judgment is ascertained in a meaningful way and supported by the evidence.  *See Greenway*, 143 F.3d at 55 (citations omitted).  Here, the Court finds that post-judgment interest is appropriate to compensate plaintiff for the time value of the jury award from the date of judgment going forward.  Accordingly, the Court awards post-judgment interest, which shall be calculated

by the parties and the Clerk of the Court using the formula set forth in 28 U.S.C.

§ 1961(a).

**D.** ***Plaintiff's Motion for Attorney Fees***

In light of the jury's verdict regarding Section 1983 liability, plaintiff has

made a motion for attorney fees pursuant to 42 U.S.C. § 1988.  In support of his

motion, plaintiff notes that he was the "prevailing party" for purposes of Section

1988.  Although some of his claims failed while others succeeded, plaintiff

contends that no reduction is warranted based on the degree of his success

since he had to conduct extensive discovery and trial preparation for the same

facts underlying each claim against each defendant.  As for documentation,

plaintiff submits billing statements for both of his attorneys.  Plaintiff requests an

hourly rate of only $200 for each of his attorneys, though the amount of time

spent on the case totaled 1,101.85 hours and brought the total amount of

attorney fees requested to $169,499.  In opposition to plaintiff's motion,

defendants contend that plaintiff should not receive an award of attorney fees at

all because, statistically, the majority of plaintiff's claims were rejected by the

Court or by the jury while the ostensibly successful claims are legally meritless.

Alternatively, defendants contend that plaintiff's request for attorney fees should

be reduced by at least 90% to reflect frivolous claims and litigation, double

billing, and vague time entries, among other problems.

The Court first will assess plaintiff's general entitlement to an award of attorney fees. "In any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b). "Therefore, in order to qualify for attorney's fees under § 1988, a plaintiff must be a 'prevailing party.' Under our generous formulation of the term, plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (internal quotation marks and citations omitted). Here, plaintiff made one Section 1983 claim alleging that he endured various forms of racial harassment that violated his First Amendment rights. Plaintiff won that claim against approximately half of the former supervisors and co-workers whom he sued, in addition to his former employer. The jury awarded punitive damages in the amount of $20,000 based on the conduct that it found to have occurred. These circumstances suffice to establish that plaintiff is a "prevailing party" for purposes of Section 1988, and that some type of award for attorney fees is appropriate.

The Court next will turn to an assessment of what the award for attorney's fees should be. The Second Circuit has revisited case law governing attorney fee calculations and explained that

32

In [*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110 (2d Cir. 2007), *amended on other grounds by 522 F.3d 182 (2d Cir. 2008)*], we undertook to simplify the complexities surrounding attorney's fees awards that had accumulated over time under the traditional "lodestar" approach to attorney's fees (the product of the attorney's usual hourly rate and the number of hours worked, which could then be adjusted by the court to set "the reasonable fee"), and the separate "*Johnson*" approach (a one-step inquiry that considered twelve specified factors to establish a reasonable fee). 493 F.3d at 114. Relying on the substance of both approaches, we set forth a standard that we termed the "presumptively reasonable fee." *Id.* at 118. We directed district courts, in calculating the presumptively reasonable fee, "to bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." *Id.* at 117 (emphasis in original). The presumptively reasonable fee boils down to "what a reasonable, paying client would be willing to pay," given that such a party wishes "to spend the minimum necessary to litigate the case effectively." *Id.* at 112, 118.

*Simmons v. N.Y. Trans. Auth.*, 575 F.3d 170, 174 (2d Cir. 2009).

In reviewing plaintiff's motion and its associated billing records, the Court agrees with plaintiff on several matters of general principle. First, the $200 hourly rate that each of plaintiff's attorneys seek is reasonable not only because it fits the nature of this case and the experience that counsel brought to it, but also because it is less than the maximum hourly rate for partners that this Court has permitted. *See, e.g., N.Y. Life Ins. Co. v. Hassan*, No. 09-CV-1075, 2010 WL 3070091, at *3 (W.D.N.Y. Aug. 4, 2010) (Arcara, *J.*) (citing $240 as the highest current hourly rate). The $40 hourly rate for paralegals and the $20 hourly rate for clerical staff likewise are reasonable. Second, counsel's billing records are not necessarily repetitive just because they both worked on a particular event, so

long as they establish what their contributions to those events were. Finally, the Court does not need to reduce any award of attorney fees just because plaintiff lost the same Section 1983 claim against some individual defendants that he won against others. *See Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) ("Attorney's fees may be awarded for unsuccessful claims as well as successful ones, however, where they are inextricably intertwined and involve a common core of facts or are based on related legal theories.") (internal quotation marks and citations omitted).

That said, however, a correction is necessary because the Court is concerned about the level of detail provided to substantiate counsel's billing entries. "[A]ny attorney—whether a private practitioner or an employee of a nonprofit law office—who applies for court-ordered compensation in this Circuit for work done after the date of this opinion must document the application with contemporaneous time records. These records should specify, for each attorney, the date, the hours expended, and the nature of the work done." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). Here, plaintiff's itemization includes numerous entries about unspecified conferences, telephone calls, e-mail correspondence, and "reviews." These entries at times appear somewhat repetitive, and they do not make clear how the time described advanced the case through discovery and to trial. Even the more self-evident entries like "depose witness" or "on motion affirmation, exhibits, etc." do not

identify which witness or motions were involved, and thus are very cryptic about why counsel did what they did. *Cf. Sabatini v. Corning-Painted Post Area Sch. Dist.*, 190 F. Supp. 2d 509, 522 (W.D.N.Y. 2001) (Larimer, *C.J.*) (finding as inadequate billing entries like "hearing preparation," "prepare for hearing," "review records," "telephone conference with client," and "prepare for discovery"). A reduction in the hours claimed is appropriate under these circumstances, but because "it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application," *Walker v. Coughlin*, 909 F. Supp. 872, 881 (W.D.N.Y. 1995) (Larimer, *J.*) (internal quotation marks and citations omitted), the Court finds that a 50% across-the-board reduction in claimed hours is appropriate. *See Disabled Patriots of America, Inc. v. Niagara Group Hotels, LLC*, 688 F. Supp. 2d 216, 227 (W.D.N.Y. 2010) (Skretny, *C.J.*) (applying percentage reduction) (citing *Sabatini*). The adjusted total of claimed time thus amounts to 550.93 hours, and the adjusted award for attorney fees amounts to $84,749.50.

### E. *Plaintiff's Motion for a Bill of Costs*

The final motion that the Court needs to consider is plaintiff's motion for a bill of costs. Plaintiff submitted a bill of costs in the amount of $14,704.78 to cover filing fees, deposition costs, witness fees including expert witness fees, and copying costs. Defendants oppose the motion on the grounds that expert witness fees do not belong in a bill of costs, that witnesses who did not actually testify at trial should not be compensated, that deposition transcript costs

unsupported by receipts should be ignored, and that postage is not recoverable. In reply to defendants' opposition, plaintiff contends that deposition transcript invoices can be obtained if necessary and that witness fees can be assessed for witnesses who do not testify, as long as the witnesses were not frivolous and any decision not to call them was meritorious. Plaintiff does, however, acknowledge that his expert should not receive more than the $40 ordinary witness fee and that postage is not recoverable. Plaintiff thus has reduced the amount of his bill of costs to $10,805.48.

"Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." FRCP 54(d)(1); *see also* 28 U.S.C. § 1920 ("A judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; [and] (5) Docket fees under section 1923 of this title."). Here, the Court agrees with defendants that only those deposition transcripts confirmed by invoice should be taxed as costs. *Cf. Internet Law Library, Inc. v. Southridge Capital Mgmt. LLC*, No. 01 Civ. 6600, 2010 WL 3290965, at *8 (S.D.N.Y. Aug. 11, 2010) ("[T]he Court will reduce the taxable costs to include only those amounts clearly indicated on the invoices to

represent a non-expedited original and one copy of the deposition transcript as well as the costs for reproduction of deposition exhibits."). The Court thus will reduce the bill of costs by $3,789.68 on this basis. The Court will reduce the bill of costs by an additional $541, the amount in witness fees that plaintiff seeks for witnesses who did not testify as a result of counsel's discretion. Plaintiff is generally correct that the presumption of paying witness fees only for witnesses who testify at trial "can be overcome if it appears that a court order or some other extrinsic circumstance rendered his testimony unnecessary." *U.S. for Use & Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 173 (2d Cir. 1996) (citations omitted). Plaintiff has not pointed, however, to those specific rulings or stipulations that would have led to a preclusion ruling if the witnesses in question had attempted to testify.

After the reductions that the Court has decided to apply, plaintiff's final bill of costs amounts to $6,474.80.

IV.    **CONCLUSION**

For all of the foregoing reasons, the Court hereby rules as follows:

1.    Defendants' FRCP 50(b) motion for judgment as a matter of law (Dkt. No. 189) is denied in its entirety.

2.    Defendants' motion to revise the judgment (Dkt. No. 195) is granted. The new final judgment shall mention plaintiff's claim for unlawful termination as the sole basis for the award of back pay of $304,775.

37

3.     Plaintiff's motion for pre- and post-judgment interest (Dkt. No. 173)

       is granted.  The Court awards $60,050.85 in pre-judgment interest.

       The parties and the Clerk of the Court shall calculate post-judgment

       interest from September 7, 2010 in an amount to be determined

       pursuant to 28 U.S.C. § 1961.

4.     Plaintiff's motion for attorney fees (Dkt. No. 175) is granted in part.

       The Court awards plaintiff $84,749.50 in attorney fees.

5.     Plaintiff's motion for a bill of costs (Dkt. No. 177) is granted in part.

       The Court awards $6,474.80 in costs.

6.     Plaintiff's total award, subject to post-judgment interest on the back-

       pay portion, is $456,050.15 plus the $20,000 award for punitive

       damages, for a total of $476,050.15

SO ORDERED.


                              s/ Richard J. Arcara
                              HONORABLE RICHARD J. ARCARA
                              UNITED STATES DISTRICT JUDGE

DATED: March 1, 2011